## THE SOUTH AMERICA.

MAGOWAN *v.* ANDREWS and another. (Libel *in Personam.*)

ANDREWS and another *v.* THE SOUTH AMERICA. (Libel *in Rem.*)

*(District Court, D. Delaware. April 24, 1886.)*

1. CHARTER-PARTY—RULE OF CONSTRUCTION.
    In the absence of fraud or misrepresentation in the inception of a charter-party, the owner and charterers must be governed by its express terms.
2. SAME—SEAWORTHINESS—IMPROPER STOWAGE.
    A. & L. hired a barge from its owner for the special purpose of carrying stone from any place on the Delaware river to the breakwater in Delaware bay. After she had been loaded for her second trip with about 700 tons of

stone, a large portion of which was placed on deck, and the balance beneath the hatchways without being distributed evenly over the bottom, and while being hauled out into the main channel of the river, the wind and tide being strong from the S. W., she careened, and went over on her beam ends, losing all of the deck-load, and drowning four of the crew. *Held*, on the proof, that the accident was caused by the careless, negligent, and unskillful loading and stowing of the stone by the charterers and their servants, and that the owner was not liable for any loss or damage on his warranty of seaworthiness.

3. SAME—PERIL OF THE SEA.

On her last trip, after arriving at the breakwater, and while discharging cargo, the barge sprung a leak, and was towed towards shore, sinking in 21 feet of water. *Held*, on the proof, that the leak was caused by the scraping of the stones down the side of the boat when unloading, whereby one of the bottom planks was started, and as the charterers had taken no precautions to protect the sides, or in any manner to guard against such a result, they must abide the consequences. In no sense can a loss arising from such a cause, and under such circumstances, be attributed to a peril of the sea, or to the un-seaworthiness or faulty construction of the boat.

In Admiralty.

*Levi C. Bird*, for libelant.

*J. H. Hoffecker, Jr.*, for respondents.

WALES, J. These are cross-libels on the same charter party, and may be considered together, the testimony taken in the first case being applicable to both. Andrews & Locke, having a contract with the United States to deliver 30,000 tons of stone at the Delaware break-water, on or before the thirtieth of June, 1885, chartered the barge South America from Robert A. Magowan, its sole owner, for the special purpose of carrying the stone from Wilmington, or any other place on the Delaware river, or its tributaries, to the breakwater, for the term of six months from the first day of January, 1885, at the rate of $400 per month, payable monthly; and with the reserved right to Andrews & Locke to renew the charter-party after the expiration of that term, from month to month, at the same rate, until the end of the year. Neither tonnage nor measurement is given in the charter-party, but the proof shows that the barge is 170 feet in length, 23 feet and 9 inches on top and 20 feet at bottom in breadth, and 13 feet 9 inches in depth. The hatchways are 6x8, with the exception of one, which is 14x8.

The owner stipulated to keep her in good repair, and the charterers agreed to return her at the expiration of the contract "in condition as when chartered, necessary and usual wear, tear, stranding, sinking, or the perils of the sea whatever accepted," either at Wilmington, Havre de Grace, or Philadelphia, as might be designated by the owner. The charterers were also to furnish officers and crew, and all needful appliances, not expressly stipulated for, for loading and unloading, and to pay the expenses of running the barge. Andrews & Locke took possession of the barge on the first of January, 1885, and after fitting her out with engine, cranes, and other apparatus for hoisting, brought her to the railroad pier on the Delaware to receive her first cargo. Here she was detained by an ice

blockade until the eleventh of March, when she carried the first load of stone, consisting of about 700 tons, of which about 250 tons were placed on deck, "it being found," as alleged in the libel of Andrews & Locke, "impracticable and unsafe to load her otherwise." The charterers further say that, owing to the necessity for handling the stones so many times in loading in the hold and unloading therefrom, it was found utterly impossible to make as many trips per month as were desired, and it was not until the fifth of April that she was loaded for the second trip. On this occasion, as alleged, at the suggestion of and under the supervision of Magowan, the charterers put a larger load (325 tons) on her deck than before, and 428 tons in her hold. She was then taken in tow by a tug, and hauled out into the river at a distance of about 500 feet from the end of the pier, and, when the tug started to straighten the barge in the main channel, the force of the current and a strong S. W. wind caused her to careen, and all the stone and other movable property on deck were lost overboard, and four of the crew drowned. After she had been righted and repaired the barge carried three more cargoes, to-wit: One on the fifteenth of May, of 750 tons, of which 250 tons were on deck; one on the twenty-eighth of May, of 750 tons, distributed in the same way; and one on the ninth of June, of 688 tons, of which about 250 tons were on deck. On this last trip, after arriving at the breakwater, and while discharging cargo, it was discovered that the barge had sprung a leak. She was immediately towed toward shore, and sank near the government pier. The agents of the companies which had insured the barge for the owner took possession of her within a day or two after the sinking, pumped her out, and towed her to a ship-yard at Wilmington for repairs, from which time the charterers ceased to have any actual possession of the boat. The same companies had, through their agents, temporary possession of the barge while undergoing repairs after the accident on the fifth of April.

Andrews & Locke claim damages for losses sustained by reason of the unfitness of the barge for the special purpose for which she was chartered, and of the fraudulent representation of the owner that she would carry 600 tons of stone on deck, by which they were induced to enter into the charter-party. In consequence of delay in loading and unloading they were obliged to get an extension of their contract with the government, and to construct, at great expense, barges better adapted for their purpose. Magowan sues for the recovery of the monthly payments from April to December, inclusive, with interest on each from the time it was due. The charter-party contains no warranty or representation of the capacity of the barge, or of the quantity or manner of carrying a cargo. She is described as "stanch, sound, and seaworthy," and it is stipulated that the owner will provide certain chains, anchors, and mooring lines. Magowan denies having guarantied orally or in writing that the barge would carry 600 tons on her deck. He had no knowledge or experience

on the subject. His boat was new,—had never before been used. She was well built, of the best materials, at a cost of $20,000. Locke had frequently examined her at Havre de Grace, where she was built, and on one occasion had brought with him an expert from Baltimore, and they had measured her inside and outside. Locke admits that he took Capt. Henry to Havre de Grace "to get his judgment in regard to what she would carry altogether,—as to what her tonnage would be." Locke's statement that Magowan assured him the barge would carry 600 tons on deck is denied by the latter, and is uncorroborated. The fair inference from the conduct of Locke in seeking the opinion of Capt. Henry is that he did not depend on anything that was said by Magowan in relation to the capacity of the barge, and that he was not induced thereby to enter into the charter-party. There was no concealment or misrepresentation on his part. Andrews & Locke knew as much as he did about the carrying capacity of the boat, and, in the absence of any proof of fraud in the inception of the charter-party, both parties must be governed by its express terms or stipulations.

The charterers contend that the careening of the barge off the railroad pier was the direct or immediate result of her faulty construction; that she was cranky, top-heavy, unfitted for carrying any cargo, and therefore unseaworthy. The testimony on this point is very voluminous, but a careful examination of the evidence has convinced me that the cause of the mishap in April was the unskillful and careless loading of the barge. The testimony of the master, Wills, and of the marine inspector, Crowell, leaves no room for doubt that had the cargo on the fifth of April been properly stowed, with two-thirds in the hold and one-third on the deck, or half and half, the accident would not have occurred. The stones weighed from one to three tons each, averaging one and a half tons. Wills says that it was difficult to get them into the hold, they were so large. He put them in the hold, stowing as best he could under the circumstances, and had about half the load on deck. "That was what he aimed to do." "The stones were very heavy and irregular in shape." To the question, "(9) Was or not this barge when so loaded, on this occasion, in your judgment, top-heavy?" he replies, "Yes, sir." "(10) Was or not that the reason largely, in your judgment, why she careened? Answer. Yes, sir. (11) Was she or not, in your judgment, for the purpose for which she was then being used, unseaworthy? A. If I could have got those stone in her hold she would have been all right; under the circumstances, she was not. The stone were in such shape that you could not stow them in her hold to load her." "(14) Then, how could she carry the load? A. We stacked them up on her all the same." "(18) Then, in your judgment, if you could have gotten a larger portion of her cargo in her hold and less on her deck, you think she would not have been top-heavy. A. No, sir; she would not have been top-heavy. (19) Do you think she could have carried

a larger cargo on deck than she did in safety? *A.* Yes, sir; by stowing the hold properly, she could." Such is the testimony given by the master, a witness called by the charterers on his direct examination. He was in charge of the boat from January to the fifth of June, and the loading was under his sole charge and direction.

Capt. Crowell, a witness for the owner, a marine surveyor of 13 years' experience, inspected the barge before and after she was launched, as agent of the insurance companies. He considered her sound, stanch, and seaworthy, and fit to carry any cargo if properly stowed. He saw her at the railroad pier while lying on her beam ends, and "found the stone was placed in the hatchways, and between the hatches and in the bilges there hadn't been any stone; and a large deck-load made her top-heavy." It was his opinion "that if the barge had been properly stowed,—the cargo in it properly stowed and carried out to the sides, and between the hatches,—with the number of tons she had on deck, she would not have capsized."

Capt. Hughes, the owner of several barges, says that in loading a barge the larger portion of the cargo must be placed on the bottom; "that every man handling a barge ought to know, and is supposed to know, the depth and width of her, and how to load her,—if he don't, he will get himself into trouble."

The opinions of Jones and Denny, both practical men, are to the effect that, with her cargo properly distributed,—from one-half to two-thirds in the hold and the balance on deck,—the barge could safely carry 700 tons.

Mr. Moore, at whose ship-yard in Wilmington the barge was fitted out in January, says: "If the charter-party don't require her to carry stone on her deck, she was perfectly seaworthy."

It is unnecessary to make further extracts from the depositions. The judgments or opinions of two or three of the workmen who repaired the barge after each accident are not sufficient to outweigh the testimony of the master and marine surveyor, or to contradict the admissions of Mr. Locke. The barge was all that she was warranted to be by the charter-party, and the cause of her upsetting in the river was due solely to the bad and negligent stowing of the cargo. Had one-half of her load on that occasion been evenly distributed over the bottom and along the sides of the boat, she would not have careened. The charterers were in too much haste to load and unload; too eager to save time in taking on and discharging cargo; and, for their own convenience and advantage, and to save expense, chose to run the risk of carrying heavy stones "stacked up" in the hatches, and on deck, without regard to proper stowage, or to wind and currents. The master saw the danger, but did the best he could under the circumstances. For the natural consequences of such carelessness and want of ordinary skill on the part of the charterers or their servants the owner cannot be held responsible.

The origin of the leak which caused the sinking of the barge at the

government pier is not explained in such a way as to relieve the charterers from fault. The concurrent testimony of all the witnesses proved that the boat was well built, out of the best materials. Mr. Locke says:

"It was one of those unforeseen accidents that there is hardly any accounting for, unless it was in the improper construction of the barge. This barge was planked across the keelsons, the planks running across her keelsons to the outside of her side planking. Had her outside keelsons been rabbeted to have caught the plank without the running to the outside of the plank, the accident could not have happened. * * * At the point where we discharged these stone the water was 60 feet deep. The stone, of necessity, had to be dumped from the side of the barge. There was very little, if any, careening done when the stone was thrown from the side of the vessel into the water, but the cause is in some cases in putting over a stone that was not square; but then, when it would strike in the water, the water directed it from the vessel, and if it struck in a different way, the same thing would happen *towards* the vessel. And I believe that a stone of that kind struck so in the water; that this stone took a course under the vessel, and struck the ends of the planking in the bottom, which started the plank. Had she been otherwise constructed it could not have happened."

Capt. Kershaw, the superintendent of the ship-yard where the barge was repaired, says:

"She had the planks started on her bottom. It is customary, for that kind of work, to rabbet the plank in the bilge-log; then if a stone should fall it could not hit the plank. It could not hit it at all in a round-bottom boat."

To question 18. "Unless this boat had been cranky and top-heavy, would a stone, in your judgment, have struck the bottom planking at all? *Answer*. That is a little hard to answer. A stone striking the water might shoot one way or another,—slue in or out."

This is all the evidence on this point, and it is wholly unsatisfactory, inconclusive, and conjectural, so far as it relates to the faulty construction of the barge. The manner of dumping over the stones, the state of the weather and condition of the sea on the tenth of June, are not described, and we are not positively told whether the leak was caused by defective and improper construction or by an accident that could have been foreseen and avoided by ordinary precautions in discharging the cargo. One thing would appear to be certain, and that is, that it would require a vessel to be of a very strong and peculiar build to stand the scraping of stones weighing from one and a half to three tons each along her sides, when dumped from her deck into the water. No special efforts seem to have been made to protect the sides when the boat careened, or a thin stone slued in towards her bottom. The charterers knew that the barge was built with "wall sides," tapering towards a flat bottom which was but three feet and nine inches narrower than the top. It is obvious that a slight careening would bring the side in contact with a stone falling perpendicularly from the deck, and that such careening could be caused either by a wave of the sea or by the sudden discharge of a heavy weight from one side of the deck. In either case it was the

duty of the charterers to have exercised ordinary care and skill in throwing over these huge stones, and there is a total want of evidence to show that they did so. The unloading may have been, and probably was, conducted with the same reckless negligence and haste as were exhibited in stowing the cargo on the fifth of April. The charterers were under pressure to complete their contract with the government. They chose to run some risks, and they must abide the result. It is not contended that the sinking was caused by a peril of the sea, and there is no proof that the barge or its owners were in fault.

The claim of Magowan for the monthly payments after the end of June, at which time the charter-party was to expire by its own terms unless renewed by the charterers, cannot be allowed. The charterers did not, it is true, actually deliver the possession of the boat to its owner at the end of the first six months, or give notice to him that they would not renew the charter-party; but it was not necessary for them to do either, because the owner had knowledge of the fact that the insurance agents and ship-builders had taken and obtained pos-session of her from and after the tenth of June until she was seized by the marshal at the suit of Andrews & Locke, and that she had been in the custody of that officer ever since.

The only question remaining is whether the charterers should pay the hire for the whole month of June. In view of the history of the case, and with my conviction of the real causes of the sinking of the boat, I think they should be held liable. A decree will therefore be entered for the owner for the sum of $1,200 with interest on the monthly payments for April, May, and June from the dates on which they were respectively due until the entry of the decree, with his costs in this suit.

The libel of Andrews & Locke is dismissed, with costs.